Kister v. Quality Correctional Health Care We will hear first from Mr. Dunn. Good morning, Your Honor. McKinley Dunn on behalf of Appellant John Kister and may it please the Court. John Kister arrived at the Morgan County, Alabama jail in May 2015 with a prescription for Tramadol and a near 20-month history of treatment with narcotic pain medication to never allowed to receive his prescription medication once he arrived. The record shows that the reason defendants denied Mr. Kister access to Tramadol was not based on well-reasoned medical judgment but was based solely on a blanket non-narcotic policy. In fact, there is evidence that the primary treating physician at the jail, Dr. Andrews, admitted to Mr. Kister that there was no medical reason not to treat me, just a policy prohibiting it, which is beyond his authority. The District Court erred by failing to consider this and other evidence submitted by Mr. Kister, by failing to view the record in the light most favorable to Mr. Kister, and by finding that there was no genuine dispute of material fact with respect to Mr. Kister's claims against the medical and jail defendants. As this Court is well aware, a Section 1983 claim based on deliberate indifference to an inmate's serious medical need first requires a showing that the inmate had a serious medical need. This requirement was assumed to have been met for purposes of summary judgment in the District Court, and I believe correctly so. The standard under Eleventh Circuit case law for a serious medical need is defined as one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention or, importantly, it is one that has been diagnosed by a physician as mandating treatment. And so there is sufficient evidence in the record to meet that second prong. At the time of his incarceration, Mr. Kister's ongoing condition had required significant treatment evaluation and medication from multiple physicians since October 2005. Importantly, one of his treating physicians, Dr. Dean Willis, stated in March 2015, just two months before Mr. Kister was incarcerated, that his condition requires continued medical attention and specific follow-up treatment. To that point, there is evidence in the record that Mr. Kister had an active tramadol prescription at the time of his incarceration, and the fact that he prescribed that medication to Mr. Kister in the years leading up to his incarceration is evidence that his condition mandated treatment. So we would suggest that there is significant evidence in the record to meet that objective element of the deliberate indifference claim. As this Court well knows, a plaintiff must also establish that the medical defendants had subjective awareness of the serious medical need. The law is clear on that point that a defendant cannot simply bury his head in the sand and claim that he lacks subjective knowledge. In fact, the Gobert case from this Court in 2007 looked at the deliberate indifference case law and stated that a party that willfully blinds itself to a fact can be charged with constructive knowledge of that fact. Can I ask you a question about the medical records that Mr. Kister presented to the defendants in this case? I guess my question about that is, did any of those records say specifically that he needed to take tramadol? Your Honor, from what I can tell from the record, Mr. Kister brought with him to a meeting with Dr. Andrews just a small portion of the records that the QCHC defendants were able to obtain, and those were just from one physician, Mr. Kister's primary physician, that had treated him just immediately prior to his incarceration, and she did in fact prescribe tramadol to treat his condition. There are other records, medical records, in the record, and those are ones that it's my understanding Mr. Kister was able to obtain on his own. It's not a complete set of medical records. It's sporadic. I guess my question is, it would be helpful to me to know which of Mr. Kister's medical records the defendants had available to them or could have obtained and were asked to obtain. Can you describe that universe of documents for me, please? Yes, Your Honor, and those would be the medical records that Mr. Kister obtained on his own, and there's evidence in the record in front of this court that he had those records in his possession and asked several of the medical defendants to review them. There's evidence in the record that they refused to do so or said they had no need to. How would we know what's in those medical records that he brought to them? Several of those records are actually in the record in front of this court. I guess my question is, is that the entirety of the universe of documents that were provided to the defendants here? That's my understanding from Mr. Kister's affidavit is that the medical records that are in the record in front of this court are the ones he had in his possession and the ones he brought with him or requested that medical defendants review. I believe the evidence shows that the only records actually reviewed by the medical defendants were the ones from Dr. Smith, who treated Mr. Kister just immediately prior to his incarceration. Again, the records in his possession dated back to, I believe, October of 2005, which is when this condition began. Right, and among those records is one, is a record saying that Tramadol, that shows the, I guess, the attempts to treat Mr. Kister with different drugs before he was at the facility and the ineffectiveness of the various different drugs until Tramadol was eventually prescribed, right? I believe that's correct, Your Honor. There is record that other narcotic medications were tried at certain points. I believe Mr. Kister was put on methadone for a short amount of time. I believe early on in his condition, he was prescribed Lortab for a certain amount of time, and it appears that Tramadol was what treated his condition and addressed his pain the most effectively. And when we review the records from the time of his incarceration back to the time when this condition began, we can see that Tramadol is the majority of what was prescribed to treat his condition. Can I ask you something else? Yes, Your Honor. The drugs that, the non-narcotic drugs that the defendant sought to treat him with, is there anything in those medical records that indicates whether those were previously tried and did not work? Yes, Your Honor. I believe Cymbalta was one of those drugs, and there was one more, and its name escapes me at the moment. Effexor or something. Effexor. I believe that's correct, Your Honor, and I think the medical records suggest that those two were ineffective, and I think we see complaints from Mr. Kister when he was put on those medications actually during his incarceration that those increased his pain. And the only other two drugs that were offered, I believe, to Mr. Kister were ibuprofen and Tylenol, over-the-counter medication. At no point was any narcotic pain medication offered to Mr. Kister, certainly not Tramadol, and we can see, or there is evidence in the record that the reason for that is because the Morgan County Jail had a blanket non-narcotic policy. We can see clearly from the record that QCHC's own records state this facility has a non-narcotic policy. We see statements from Nurse Turner, I believe it is, that states there is a non-narcotic policy in this facility. Mr. Kister is also told at other times that he can't have Tramadol because that's not on the formulary here. So there is sufficient evidence in the record when viewed in the light most favorable to Mr. Kister, as is appropriate, that the facility had a non-narcotic policy that was facility-wide. And that's really where the deliberate indifference prong is met in this case. Well, that's not quite right. Didn't they allow narcotics to be used in, I think it was two cells, two medical observation cells? There is evidence of that, yes, Your Honor. I believe that comes from an affidavit submitted by the jail defendants that there are two medical observation cells where narcotic pain medication potentially could be allowed. And I would point out that the defendants admit that indeed there were only two cells and that those cells were used for instances such as when a patient had surgery and needed to be evaluated for a short period of time. The record indicates those cells were not intended to be utilized for a long-term stay. But again, if we view the evidence in the light most favorable to Mr. Kister, there's also evidence in the record, indeed the QCHC's own written documents sent to outside providers and comments made by medical defendants that the narcotic policy was facility-wide. Can I ask you something else about that? Didn't Mr. Kister ask to be put in the medical, one of those two cells so that he could receive Tramadol? There is evidence in the record of that, yes, Your Honor. And I believe he asked Sheriff Franklin about that potential and that potential was denied to him. So there's no evidence in the record that I'm aware of that narcotic medication actually was allowed if he were to have been in that cell because he was denied the opportunity. The reliance on that blanket, no narcotic policy, again, is what meets the deliberate indifference standard or that's the evidence of it in this case. This court has held in a ONCOTA case that a refusal to address an inmate's medical condition for non-medical reasons shows deliberate indifference. We have evidence of that in this case. The appellees argue that a medical judgment was made and so it was a physician's medical judgment, not the blanket, no narcotic policy that was the reason Mr. Kister could not have Tramadol. But there is also evidence in the record that Dr. Andrews, again, the primary physician, stated that there was no medical reason not to treat me, just a policy prohibiting it, which is beyond his authority. The record, that same record, which includes a response from one of the nurses, the nurse responded, the same policy prohibiting Dr. Andrews also prohibits me. And I believe my time's almost up, Your Honor. All right. Yes. Thank you. You've reserved three minutes for rebuttal. Thank you, Mr. Dunn. All right. We'll hear next from Ms. McCallum. May it please the Court, LaBella McCallum, and I represent the QCHC Medical Care Defendants, and I'm going to take the first ten minutes of the argument. Thank you. So, I want to mention this in his recommendation, but there is a footnote in our brief that implies that Tramadol was an active prescription for Mr. Kister when he came into the facility. When I got down and looked at the Walmart records for his prescriptions during this period of time, the last time that he filled that prescription was April the 7th, after his last visit with Dr. Smith, who had released him to refer him to another doctor. And one of the reasons is set out in her two documents that we did have Dr. Andrews looked at in the jail was that he was requesting an increased amount of Tramadol that she did not agree with and would not give it to him. That prescription was for 90 pills to be taken two times a day, and that prescription would have had to have been refilled by him coming back to see Dr. Smith based upon her policy of a 30-day policy before she would give another refilled prescription. There's nothing in the record that he did go to the other doctor and get an active Tramadol prescription at that time. There is no blanket policy at the jail. Let me ask you a question if you don't mind. I think the question here is whether there is a material dispute of fact, and it seems like there is a material dispute of fact in that the issue that would be material here would be whether the denial of the Tramadol was for a medical judgment kind of reason, or whether it was not for a medical judgment kind of reason, but instead was because there was a no narcotic policy. And we have the evidence in the record of Mr. Kister saying that the doctor told him that there was no medical reason he could not have Tramadol, but there was a policy against narcotics. Why does that not create a material issue of fact about whether there was a medical judgment here? Well, I think that the explanation for that comes down to what they're talking about in Appellate's brief acknowledges that the warden, Warden Dawson, defined the jail's narcotic policy is that you cannot have narcotics in the general population. It has to be in medical observation. Sheriff Franklin with the jail on page 14 of the Appellate's brief admits that narcotics can only be provided in medical observation. The jail did not take the position that they had a blanket policy. Can I stop you again for another question related to that? In the record, he says that he asked to be in the medical cells so that he could receive the Tramadol, and that he was denied that ability. Why does that situation not address the evidence that you're referring to? In other words, why doesn't that put us right back into the problem of the medical policy? I'm going to be very frank in telling you that I have not seen that in the record, which does not mean that it's not in the record, but I've not seen it. What I remember seeing is that the three times he was placed in medical observation, he protested that and in fact originally sued for retaliation, complaining that he was put in medical observation as punishment and not for legitimate medical reasons. And the reasons that he was put in medical observation on those three occasions was he was having pain, difficulty in urinating due to one of his medications, which the doctor suggested, and for observation. On one of those three occasions, the last one, the sheriff ordered that he go into medical observation until Dr. Andrews could see him. But I missed that he had asked to be in medical observation to receive Tramadol there, but let me answer that assuming that's in the record. Thank you. I appreciate that. The answer is that the decision not to give him Tramadol was based upon a medical judgment by his doctors who did assess him along with the nurses on each and every occasion that they saw him for any objective support that he was in pain. They took the fact that there was no objective sign of pain at all, it's very clearly documented in their records, coupled with the fact that there were long gaps of time when he did not even complain of pain, months at a time, including a year from the last time he complained of pain to Dr. Andrews to the time that he was released. So the doctors and the nurses don't have anything of course to do with whether or not he's given medication or not. Their job is to keep the doctor informed and the doctor had all the information about the situation as the nurses did. So there's no subjective awareness on the nurse's part that arises deliberate indifference. There was a period of time that Dr. Andrews notes on November the 9th, I believe it was 2016, that he had been on ibuprofen for four days and the MARS, the medical administration record, shows that he was given ibuprofen on the 4th, two doses on the 5th, two doses on the 6th, and one on November the 7th for an injury that he suffered on his way to court when he fell. Dr. Andrews seeing him on the 9th, one of his complaints being penile pain, noted in his records that his penile pain had abated over four days. Now the record does not say over the four days he took the ibuprofen, but when you look at the timing that is clearly documented in the records, it's got to be those four days of November the 4th through the 7th that he was on ibuprofen for his other injury. He refused to try ibuprofen at all other than that one situation. So Dr. Andrews and Dr. Bates didn't put him in medical observation so he could have Tramadol because they made a medical judgment that that was not an appropriate medication for him. He did exhibit drug-seeking behavior in the past based upon some of his doctor's records that they did not look at, I understand, but also the fact of the matter is that Tramadol was not effective according to Mr. Keister in the past with his doctors and he wanted more Tramadol even than Dr. Smith felt comfortable in giving him. So you can't, the medical doctors in the jail don't leave their medical judgment at the doorway of the jail. They get to make their medical decisions based upon what is in front of them at that time and also based upon the risk to Mr. Keister in terms of being addicted to a narcotic judge. I think that may all turn out to be the case. But for summary judgment, we have to see whether there is a material issue of fact. And the other evidence that he submitted of there being a policy, a no-narcotics policy, is a response to a grievance from Nurse Turner that said Tramadol is now considered a narcotic so we don't use it in the facility. A document provided to an outside provider that said, please note we have a no-narcotic policy. Mr. Keister's opinion, we can't give narcotics. Dr. Andrews' visit notes stating that Keister wanted a policy change so he could have Tramadol. Dr. Bates' visit notes stating we have no other options because Keister only wants Gold Tram, which is Tramadol's generic, or narcotics. And Nurse Turner's grievance response saying the same policy prohibiting Dr. Andrews also prohibits me. And finally, Dr. Andrews' visit notes stating that he advised Keister that there is no medical reason why he couldn't have Tramadol, but he couldn't have it because it was against the policy. Why doesn't that create a material issue of fact? And why isn't that something the jury gets to resolve? Because, Your Honor, it's very clear from the record that the policy dealt with Tramadol in the general population. Nurse Kelly told Mr. Keister during his 5-17-16 visit with her that Tramadol would only be administered in medical observation. And to finish answering your question, this is the reason why there is a confusion somatically in the record but does not rise to a material fact difference. Mr. Keister did not like being in medical observation. That's undisputed in the record. He wanted Tramadol in the general population. It is a very reasonable inference that when Dr. Andrews references the Tramadol policy he's talking about in the general population. But our problem is, on summary judgment, we can't draw reasonable inferences in favor of the moving party. We can draw reasonable inferences in favor, I mean, we have to draw all reasonable inferences in favor of the non-moving party. So, I don't know, I want to just give you a second to address that and then I'll ask you to sit down since the time is up. But I know I've asked you this question and I'd love to hear the answer. Well, I think that the record is clear that the policy was a no Tramadol in general population, the jail's policy was no Tramadol in the general population. I mean, that is conceded in the record, testified that he prescribed narcotic pain medication when they felt like it was medically appropriate. And so, I think the record is clear and undisputed as to that fact. It's just that it was not allowed in general population and I don't think the general references by Dr. Andrews or the other references as we've heard from the appellate's arguments mean that they meant no Tramadol in medical observation. Thank you, Counsel. All right, we'll hear next from Mr. Lockwood. May it please the Court, I'm Robert Lockwood here on behalf of Morgan County Sheriff Anna Lockwood. And I'm here to ask you a question about the Morgan County Defendants of a Serious Medical Need Act. And I'm wondering if you can give us a little bit of background on the Morgan County Defendants of a Serious Medical Need Act. I mean, I think it's obviously  and in this case, I think there is no evidence of any subjective knowledge that anybody employed by Sheriff Franklin knew of a serious medical need. And that's where I think the facts in this case really are important because what you've got is Mr. Kistler was booked into the jail, I think on May 17th of 2015, was seen for the first time on May 18th. And then there's a six months latch, six months where there are, according to the medical records, no complaints of pain. And that six months is very important because there's nothing objective, no objective serious medical need during that time. And I think that while that was assumed at the trial court level, I think it is crucial in this case that the question of when did the medical need arise? And that is not until November 18th of 2015. So this is not like every other no narcotics policy case that is out there. In every other single no narcotics, there is a blanket policy that is enforced the minute the inmate walks through the door with objective evidence of the need for the narcotics. Every single case, they come in with a valid prescription, which obviously we've demonstrated that there was no even valid prescription at the time. And then there's this shoulder shrugging indifference to those issues. But a medical need, a serious medical need can arise during the time someone is there and it's, I'm trying to remember, I think in the record I saw that at least somewhere maybe around 2017, he provided his record showing a diagnosis of neuropathy. And I mean, at that point, he had been complaining at that point for I guess at least a year or two at that point about significant pain. And then he shows the diagnosis that he has of this injury and this pain, the neuropathy, to the doctor. Even assuming that you're right, that there's not a serious medical need when he comes in, why is there not one that develops while he's there? Well, that's exactly why you have in-house medical staff, Your Honor. I think it's pretty well established they don't have to just take the word of prior medical records. They need to perform their own objective individualized assessment at the time. That's true. But in this case, according to Mr. Kister, two different medical people told him they had never heard of penile neuropathy before and they would like to see that diagnosis. So I mean, now they're informed of it and he says, can you send me to an outside provider since you all are not familiar with my diagnosis. Why doesn't that then raise the serious medical issue? Because again, there's nothing objective to support this complaint, Your Honor. Except for the medical records that he showed that he's been previously diagnosed with it and then it's an ongoing problem. Well, he's had an issue by that point at some point a year prior and more than a year prior that certainly he's had a medical diagnosis. But these individuals within the jail reviewed his vital signs, reviewed his mannerisms, saw no objective evidence of pain either physically or through the vital signs and were unable to conclude that this was anything other than a complaint that was not backed up by anything other than something that had happened a year or so more. So again, maybe it might have been negligence on their part not to then refer him out. But it was not deliberately indifferent. That truly is a difference of medical opinion. And I see my time has expired. All right. Thank you, Counsel. Mr. Dunn, you have three minutes. Thank you, Your Honor. And I just want to address a couple points. I think you hit the nail on the head a moment ago when you pointed out that the record indicates that both of the medical doctors at the jail stated that they had never heard of penile neuropathy. And that goes, again, directly to both the subjective awareness burying their head in the sand, and it goes to the medical judgment as well. But we do see evidence that Mr. Kister relays a message from, and he states that both doctors I have seen claim to be unfamiliar with my diagnosed condition. And so the record contains evidence that neither Dr. Andrews nor Dr. Bates knew what penile neuropathy was, yet both refused to look at his full set of prior records, refused to contact any prior physicians for a consult, as you pointed out, and refused to allow Mr. Kister himself to have an outside consult. Can I ask you if you would address your friend's argument over here that Mr. Kister did not want to be in the medical cells and refused to be in the medical cells to receive the tramadol treatment? Yes, Your Honor, and I'm not sure that I know where that reference comes from in the record. I know that the conversation that Mr. Kister had with Sheriff Franklin where he says he wants tramadol for his pain. She says you would have to live in medical observation. He says I will do anything necessary. That occurred on July 26, 2017. And we know from reviewing the remainder of the record that that never took place. And so I'm not aware of any other facts in the record where Mr. Kister was ever given an opportunity to live in medical observation and receive his pain medication, and he refused that opportunity. I'll also talk just very quickly. There was an argument that Mr. Kister's pain or complaints were on or off or sporadic. I think there's sufficient evidence in the record when viewed in the light most favorable to Mr. Kister to conclude just the opposite. We see complaints of continuing and severe pain. He states I'm still in pain every day. He states continuing pain in my abdomen, groin, and penis. He says my penis still hurts every day. He says I'm still suffering in pain every day. And we see from the record that these complaints continue throughout his three and a half year time at Morgan County Jail. Last thing I think we have to understand when looking at the record that most of the information in the record that's not contained within Mr. Kister's affidavit comes from the medical defendant's discreet portion of time, 28 days out of his three and a half year stay. And so we would ask that this Court reverse the summary judgment grant by the District Court. Thank you. Thank you, Counsel. And Mr. Dunn, I know that you were court appointed. We want to thank you for your service to the Court and your excellent job in representing Mr. Kister. Thank you. Do we have counsel for Mr. Petway present? Mr. Conner. All right, the next case is